## Attachment C

## Affidavit in Support of Application for Search Warrant

I, Jason B. Adams, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), currently assigned to the Resident Agent in Charge in Fayetteville, Arkansas. I have been so employed with HSI since July of 2009. As part of my daily duties as an HSI agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, transportation, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2251A, 2252(a) and 2252A. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media including computer media. I have also participated in the execution of numerous search warrants and arrest warrants, a number of which involved child exploitation and/or child pornography offenses. This affidavit is being submitted based on information from my own investigative efforts as well as information obtained from other who have investigated this matter and/or have personal knowledge of the facts herein.

2. This affidavit is being submitted in support of an application for a search warrant for the premises located at 625 W. Dickson Street, Apartment 15, Fayetteville, Arkansas 72701, herein after referred to as the "SUBJECT PREMISES". As such, it does not include all of the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant.

**Statutory Authority**

3.	This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors, which has been defined in Title 18 U.S.C. 2256, as an individual under 18 years of age.

   a.	Under 18 U.S.C. Section 2252(a)(1) (transportation), 2252(a)(2) (receipt and distribution), and 2252(a)(4)(B) and 2252A(a)(5)(B) (possession), it is a federal crime for any person to transport, distribute, receive, and possess child pornography, as that term is defined by federal law.  Further under 18 U.S.C. Section 2253(a)(3), a person who is convicted of an offense under 18 U.S.C. Section 2252 or 2252A, shall forfeit to the United States such person's interest in any property, real or personal, used or intended to be used to commit or to promote the commission of such offense.

**Peer to Peer File Sharing**

4.	Based upon my training and experience, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies.  The photographs required darkroom facilities and a significant amount of skill in order to develop ad reproduce the images. As a result, there were definable costs involved with the production of pornographic images.  To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts,

mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography use membership-base/subscription-based websites to conduct business, allowing them to remain relatively anonymous.

5. In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that the development of computers has also revolutionized the way in which those who seek out child pornography are able to obtain this material. Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage. More specifically, the development of computers has changed the methods used by those who seek to obtain access to child pornography in these ways:

6. Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that this method of production does not leave as large a trail for law enforcement to follow.

7. The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. A host computer is one that is attached to a network and serves many users. Host computers are sometimes operated by commercial Internet Service Providers (ISPs), such as America Online ("AOL") and Microsoft, which allow subscribers to dial a local number and connect to a network which is, in turn, connected to the host systems. Host computers, including ISPs, allow e-mail service between subscribers and sometimes between their own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

8. The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) websites that offer images of child pornography. Those who seek to obtain images or videos of child pornography can use standard Internet connections, such as those provided by business, universities, and government agencies, to communicate with each other and to distribute child pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions involving those who wish to gain access to child pornography over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache to look for "footprints" of the websites and images accessed by the recipient.

9. The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a "hard drive") used in home computers has grown tremendously with the last several years. Hard drives with the capacity of 160 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

10. A growing phenomenon on the internet is peer to peer (hereinafter referred to as "P2P") file sharing. P2P file sharing is a method of communication available to Internet users through the use of special software programs. P2P file sharing programs allow groups of computers using the same file sharing network and protocols to transfer digital files from one computer system to another while connected to a network, usually on the Internet. There are multiple types of P2P file sharing networks on the Internet. To connect to a particular P2P file sharing network, a user first obtains a P2P client software program for a particular P2P file sharing network, which can be downloaded from the Internet. A particular P2P file sharing network may have many different P2P client software programs that allow access to that particular P2P file sharing network. Additionally, a particular P2P client software program may be able to access multiple P2P file sharing networks. These P2P client software programs share

common protocols for network access and file sharing. The user interface, features, and configurations may vary between clients and versions of the same client.

11. In general, P2P client software allows the user to set up file(s) on a computer to be shared on a P2P file sharing network with other users running compatible P2P client software. A user can also obtain files by opening the P2P client software on the user's computer and conducting a search for files that are of interest and currently being shared on a P2P file sharing network.

12. Some P2P file sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits. In some instances, users are not allowed to download files if they are not sharing files. Typically, settings within these programs control sharing thresholds.

13. Typically, during a default installation of a P2P client software program, settings are established which configure the host computer to share tiles. Depending upon the P2P client software used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

14. Typically, a setting establishes the location of one or more directories or folders whose contents (digital files) are made available for distribution to other P2P clients. In some clients, individual files can also be shared.

15. Typically, a setting controls whether or not files are made available for distribution to other P2P clients.

16. Typically, a setting controls whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

17. Typically, files being shared by P2P clients are processed by the client software. As part of this processing, a hashed algorithm value is computed for each file and/or piece of a file being shared (dependent on the P2P file sharing network), which uniquely identifies it on the network. A file (or piece of a file) processed by this hash algorithm operation results in the creation of an associated hash value often referred to as a digital signature. Some hash algorithms provide a certainty exceeding 99.99 percent that two or more files with the same hash value are identical copies of the same file regardless of their file names. By using a hash algorithm to uniquely identify files on a P2P network, it improves the network efficiency. Because of this, typically, users may receive a selected file from numerous sources by accepting segments of the same file from multiple clients and then reassembling the complete file on the local computer. This is referred to as multiple source downloads. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. P2P file sharing networks use hash values to ensure exact copies of the same file are used during this process.

18. P2P file sharing networks, including the BitTorrent network, are frequently used to trade digital files of child pornography. These files include both image and movie files.

19. The BitTorrent network is a very popular and publically available peer to peer file sharing network. Most computers that are part of this network are referred to as "peers". The terms "peers" and "clients" can be used interchangeably when referring to the BitTorrent

network. A peer can simultaneously provide files to some peers while downloading files from other peers.

20.     The BitTorrent network can be accessed by computers running many different client programs, some of which include the BitTorrent client program, uTorrent client program, and Vuze client program.  These client programs are publically available and free P2P client software programs that can be downloaded from the Internet.  There are also BitTorrent client programs that are not free.  These BitTorrent client programs share common protocols for network access and file sharing.  The user interface, features, and configuration may vary between clients and versions of the same client.

21.     During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files. Depending upon the BitTorrent client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other BitTorrent network users to download.

22.     In order to share a file or a set of files on the BitTorrent network, a "Torrent" file needs to be created by the user that initially wants to share the file or set of files. A "Torrent" is typically a small file that describes the file(s) that are being shared, which may include information on how to locate the file(s) on the BitTorrent network.  A typical BitTorrent client will have the ability to create a "Torrent" file.  It is important to note that the "Torrent" file does not contain the actual file(s) being shared, but information about the file(s) described in the "Torrent", such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash"

of the "Torrent". The "info hash" is a SHA-1[1] hash value of the set of data describing the file(s) referenced in the "Torrent", which include the SHA-1 hash value of each file piece, the file size, and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The "Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers". "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referenced in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referenced in the "Torrent". It is important to note that the "Trackers" do not actually have the file(s) and are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing. It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent" file. There are many publically available servers on the Internet that provide BitTorrent tracker services.

23. Once a torrent is created, in order to share the file(s) referenced in the "Torrent" file, a user typically makes the "Torrent" available to other users, such as via websites on the Internet.

24. In order to locate "Torrent" files of interest, a typical user will use keyword searches within the BitTorrent network client itself or on websites hosting "Torrents". Once a

---

[1] SHA-1 or Secure Hash Algorithm Version 1 is a file encryption method which may be used to produce a unique digital signature of a file. Finding a file that produces the same SHA-1 value as a known file requires a search and comparison of $10^{48}$ ($2^{160}$) different files, which is computationally infeasible. The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS). The United States of America has adopted the SHA-1 hash algorithm described herein as a Federal Information Processing Standard.

"Torrent" file is located that meets the keyword search criteria, the user will download the "Torrent" file to their computer. Alternatively, a user can also search for and locate "magnet links", which is a link that enables the BitTorrent network client program itself to download the "Torrent" to the computer. In either case, a "Torrent" file is downloaded to the user's computer. The BitTorrent network client will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA-1 "info hash" value comparison), or parts of the same file(s), referenced in the "Torrent", to include the remote peers/clients Internet Protocol (IP) addresses[2].

25.     For example, a person interested in obtaining child pornographic images on the BitTorrent network would open the BitTorrent client application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." (It should be noted that this situation did not occur in this investigation). The results of the torrent search are typically returned to the user's computer by displaying them on the torrent hosting website. The hosting website will typically display information about the torrent, which can include the name of the torrent file, the name of the file(s) referenced in the torrent file, the file(s) size, and the "info bash" SHA-1 value of the torrent file. The user then selects a torrent of interest to download to their computer. Typically, the BitTorrent client program will then process the torrent file. The

---

[2] Computers on the Internet identify each other by an Internet Protocol or IP address. IP addresses can assist law enforcement in finding a particular computer on the Internet. IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account that used the IP to access the Internet.

user selects from the results displayed the file(s) they want to download that were referenced in the torrent file. Utilizing trackers and other BitTorrent network protocols (such as Distributed Hash Tables, Peer Exchange, and Local Peer Discovery), peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referenced in the torrent file available for sharing. The file(s) is then downloaded directly from the computer(s) sharing the file. Typically, once the BitTorrent network client has downloaded part of a file(s), it may immediately begin sharing the file with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 piece hash described in the torrent file. During the download process, a typical BitTorrent client program displays the lnternet Protocol address of the peers/clients that appear to be sharing part or all of the file(s) referenced in the torrent file or other methods utilized by the BitTorrent network protocols. The downloaded file is then stored in the area previously designated by the user and/or the client program. The downloaded file(s), including the torrent file, will remain until moved or deleted.

26.     Typically, as described above, one method for an investigator to search the BitTorrent network for users possessing and/or disseminating child pornography files is to type in search terms, based on their training and experience, that would return a torrent filename indicative of child pornography. The investigator would then download the file(s) referenced within the torrent file and determine if the file(s) indeed contained child pornography. If so, the investigator can document the "info hash" SHA-1 hash value of this torrent file, to be compared with future identical torrent files observed on the BitTorrent network. Although transparent to the typical user, when searches are conducted, additional results are received from the trackers on other peers who recently reported to the network as having that file(s) in whole or in part,

which may include the IP addresses of those peers/clients. This information can be documented by investigators and compared to those "info hash" SHA-1 hash values the investigator has obtained in the past and believes to be child pornography. This allows for the detection and investigation of computers involved in possessing, receiving, and/or distributing files of previously identified child pornography. Therefore, without even downloading the file, the investigator can compare the "info hash" SHA-1 hash value and determine with mathematical certainty that a file(s) seen on the network is an identical copy of a child pornography file(s) they had seen before.

27. The returned list of IP addresses can include computers that are likely to be within the investigator's jurisdiction. The ability to identify the approximate location of these IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection. At this point in the investigative process, an association between a known torrent file (based upon on the "info hash" SHA-1 hash value comparison) and a computer having a specific IP address (likely to be located within a specific region) can be established.

28. Once a client user is identified as recently having a file(s) believed to be child pornography, in whole or in part, the investigator can then query that client user directly to confirm the client user has that file(s), in whole or in part, and/or download that file directly from the client user exclusively, otherwise known as a single source download. Depending upon several factors, including configuration and available resources, it might not be possible to do either. The process of sharing files on the BitTorrent network involves peers allowing other peers to copy a file(s) or portions of a file(s). This sharing process does not remove the file(s)

from the computer sharing the file. This process places a copy of the file on the computer which downloaded it.

29. If an investigator either received an affirmative response from a remote peer that they possess a digital file, or the investigator received a digital file, in whole or in part, that is believed to contain child pornography, from a remote peer at a specific IP address, the investigator can conclude that a computer, likely to be in his jurisdiction, is running a BitTorrent network P2P client and is currently possessing, receiving, and/or distributing specific and known visual depictions of child pornography.

30. Law Enforcement has created BitTorrent network client programs that obtain information from "Trackers" about peers/clients recently reporting that they are involved in sharing digital files of known actual child pornography (based on the "info hash" SHA-1 hash value), which then allows the downloading of a file from a single IP address (as opposed to obtaining the file from multiple peers/clients on the network). This procedure allows for the detection and investigation of those computers involved in sharing digital files of known actual child pornography on the BitTorrent network.

31. During the query and/or downloading process from a remote BitTorrent network client, certain information may be exchanged between the investigator's client and the remote client they are querying and/or downloading a file from. Such as 1) the remote client's IP address; 2) a confirmation from the remote client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is being reported as shared from the remote client program; and 3) the remote client program and version. This information may remain on the remote client's computer system for long periods of time. The investigator has the ability to log this information. A search can later be conducted on a seized computer system(s)

for this information, which may provide further evidence that the investigator's client communicated with the remote client.

32. An analogy to this investigative methodology would be receiving information from an informant or an anonymous source that a particular residence was selling illegal narcotics. An undercover investigator could independently confirm this information by knocking on the door of the residence and asking if they had said illegal narcotics. If so, the investigator would then ask for and receive the said illegal narcotics without actually entering the residence, which would be similar to asking for and receiving an illegal child pornography file from a P2P peer/client.

33. The investigation of peer-to-peer file sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes against Children Task Force Program. P2P investigative methodology has led to the issuance and execution of search warrants around the country resulting in the arrest and conviction of numerous offenders possessing and/or distributing child pornography, some of which were also involved in the sexual exploitation of actual child victims.

### Summary of Investigation to Date

34. On June 3, 2013, Arkansas State Police Special Agent Doug Estes (SA Estes) conducted investigative activities into the sharing of "Child Pornography" files/torrents on the BitTorrent P2P file sharing network. At that time, SA Estes identified a computer with the IP address 72.204.44.119 and noted that it had been recently detected/associated with investigative torrent files of interest.

35. On June 3, 2013 at approximately 2320 hours CST, SA Estes was able to download a folder from the suspect IP of 72.204.44.119 titled "sandra-mix". Located inside that

particular folder were approximately two (2) .jpeg image files which were of nude and partially nude minor female children. One of the images downloaded is described as:

    (a)    IMG_4547.jpg:

Your affiant has reviewed this image and it is described as one (1) minor female appearing to be approximately 10-12 years of age naked in a pool. The female is standing with her arms over her head exposing her breasts.

36.    On June 5, 2013 at approximately 1540 hours CST, SA Estes was able to download an untitled folder from the suspect IP of 72.204.44.119. Located inside that particular folder were approximately sixteen (16) .jpeg image files which were of nude and partially nude minor female children. One of the images downloaded is described as:

    (a)    16112003-10211.jpg:

Your affiant has reviewed this image and it is described as one (1) female appearing to be approximately 10-12 years of age dressed in a bra and transparent panties. The female is lying on her back, holding her chest, with her vagina plainly visible through the transparent panties.

37.    On June 6, 2013 at approximately 1555 hours CST, SA Estes was able to download an untitled folder from the suspect IP of 72.204.44.119. Located inside that particular folder were approximately thirty (30) .jpeg image files which were of nude and partially nude minor female children. One of the images downloaded is described as:

    (a)    s15.jpg:

Your affiant has reviewed this image and it is described as one (1) female appearing to be approximately 10-12 years of age dressed in only white high heel shoes. The female is lying on her side on a pool table exposing her breast.

38.  On June 15, 2013 at approximately 0303 hours CST, SA Estes was able to download an untitled folder from the suspect IP of 72.204.44.119. Located inside that particular folder were approximately seven (7) .jpeg image files which were of nude and partially nude minor female children. One of the images downloaded is described as:

    (a)  Sandra-mix-22.jpg:

Your affiant has reviewed this image and it is described as one (1) female appearing to be approximately 10-12 years of age dressed in a shirt and panties. The female is standing, pulling down her panties, and partially exposing her vagina.

39.  An internet search on the origin of the IP address determined that the aforementioned IP address was assigned to an Internet service provider known as Cox Communications, Inc. A Federal Summons was issued for the aforementioned IP address at the time the child pornography was downloaded.

40.  On July 23, 2013, subpoena results were received from Cox Communications, Inc. and they identified the subscriber who was assigned the IP address at the time the child pornography was being shared and/or downloaded. The subscriber of the services is as follows:

    (a)  James R. Clary
          Apartment 15
          625 W. Dickson St.
          Fayetteville, Arkansas 72701
          479-856-4329
          Service established on or about 07/28/2007

41.  In October of 2013, surveillance conducted at the SUBJECT PREMISES identified a vehicle with Arkansas license plate number 594 SHN. Vehicle registration records show this vehicle to be registered to JAMES ROY CLARY of 625 W. Dickson St., 15C, Fayetteville, Arkansas 72701. During this same period of surveillance, JAMES ROY CLARY

was observed operating the vehicle and entering an apartment building associated with the SUBJECT PREMISES.

## Conclusion

42. Based on my experience and the training and experience of other agents, many of the items sought in this affidavit may be stored electronically. Based on my experience and consultation with computer forensic experts, I know that electronic files can be easily moved from computer or electronic storage medium to another computer or medium. Therefore, electronic files downloaded to or created on one computer can be copied on or transferred to any other computer or storage medium at the same location. In addition, based on my experience, I know that searching computerized information for evidence of crime often requires special agents to seize most or all of a computer system's central processing unit (CPU), input/output peripheral devices, related software, documentation, and data security devices, including passwords, so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

(a) Volume of evidence: Computer storage devices such as hard disks, diskettes, tapes and laser disks, can store the equivalent of thousands of pages of information. This sorting process can take up to several months to complete, depending on the volume of data stored. Therefore, it would also be impractical to attempt this type of data search on site.

(b) Technical requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know

before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional destruction (both from external sources and from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

43. Therefore, authorization is sought in this application to seize the items set forth in attachment "B" that are found on the premises to be searched, in order to examine those items for evidence. If it is determined that data has been seized that does not constitute evidence of the crimes detailed herein, the government will return said data within a reasonable time.

44. Based on my experience and the training and experience of other agents involved with this investigation, your affiant knows that individuals involved in the sexual exploitation of children through child pornography almost always keep copies of their sexual explicit material. Among the reasons copies are maintained is because child pornography is illegal to openly purchase, and the most common method of acquiring it is by trading with other people with similar interests. It is also known that due to the inherent illegality of these sexually explicit materials, they are most often kept in a place considered secure, usually a residence, to avoid detection by law enforcement.

45. Based on the foregoing information, probable cause exists to believe there is located at 625 W. Dickson Street, Apartment 15, Fayetteville, Arkansas 72701, the SUBJECT PREMISES, evidence of violations of Title 18, United States Code, Section 2252, et seq. Your Affiant prays upon his honorable court to issue a search warrant for the SUBJECT PREMISES

for the items set forth in attachment "B" (which is attached hereto and incorporated herein by reference), that constitute evidence, fruits, and instrumentalities of violation of Title 18, United States Code, Section 2252, et seq.

JASON B. ADAMS, SPECIAL AGENT

HOMELAND SECURITY INVESTIGATIONS

AFFIDAVIT subscribed and sworn to before me this 28th day of October, 2013.

ERIN L. SETSER

UNITED STATES MAGISTRATE JUDGE